| | |
|---|---|
| Z. PAPATAROS, A MINOR and NICOLE PAPATAROS g/a/l, | Civ. No. 17-9836 (KM) (MAH) |
| **Plaintiffs,** | **OPINION** |
| v. | |
| AMAZON.COM, INC., LERAY GROUP LTD., COOLREALL TECHNOLOGY LLC, ABC CORP 1-5, and DEF CORP 1-5, | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Z. Papataros, a minor, by his guardian Nicole Papataros ("Papataros"), has filed a products liability complaint against defendants Amazon.com, Inc. ("Amazon"), Leray Group Ltd. ("Leray Group"), and Coolreall Technology LLC ("Coolreall"). Papataros sues for injuries allegedly caused by a defective scooter that she purchased from Coolreall on the interactive website Amazon.com.

Leray and Coolreall have not answered the complaint. Amazon has brought a motion for summary judgment (DE 27) on the issues of whether it is a "seller" under the New Jersey Products Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C-1, and whether it is immune from liability under Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). Amazon also moves for summary judgment on claims of breach of express and implied warranty. For the reasons stated below, I will grant Amazon's motion in part and deny it in part.

My analysis is fundamentally structured by a recent relevant decision by the U.S. Court of Appeals for the Third Circuit, *Oberdorf v. Amazon.com*, 930 F.3d 136, 2019 WL 2849153 (3d Cir. July 3, 2019).

First, *Oberdorf* held that Amazon is a "seller" for purposes of Pennsylvania strict products liability law. The issue before me, then, is narrowed to the question of whether any feature of New Jersey law distinguishes it from Pennsylvania law in a way that requires a different result. I answer that question in the negative, and hold that Amazon is a seller under the NJPLA.

Second, *Oberdorf* interpreted Section 230 of the federal CDA, which provides that an interactive computer service shall not be treated as the "publisher or speaker of any information provided by" a third party, such as a third-party vendor on Amazon.com. *Oberdorf* drew what amounted to a distinction between liability based on Amazon's status as "speaker" and its status as "seller." Claims of defective warnings or failure to warn, the Court held, were "speaker" claims based on the content of the seller's posting, and hence were barred; claims of strict products liability under the NJPLA, on the other hand, were "seller" claims, and therefore not barred. Here, I follow the lead of *Oberdorf* and dismiss the failure-to-warn claims, while preserving the NJPLA strict liability claim.

## Background[1]

### a. Facts

On September 28, 2015, Nicole Papataros purchased a scooter through the Amazon website from Coolreall. (DSOF, PRSOF ¶ 5). On the listing page for

---

[1]    For ease of reference, certain key items from the record will be abbreviated as follows:

| "Cplt." | = | Complaint | DE 1-1 |
| "MSJ" | = | Defendant's Brief in support of Summary Judgment | DE 27-1 |
| Pl. Opp. | = | Plaintiff's Opposition | DE 31 |

the scooter, between the "in stock" link and the "add to cart" link, the website stated, "Sold by Coolreall and Fulfilled by Amazon." (PSSOF, DRSOF ¶ 25). Amazon.com, not Coolreall, later appeared on Papataros's credit card statement. (*Id.* ¶ 26). After making her purchase, Papataros received an e-mail confirmation from Amazon that read "Thank you for shopping with us." (*Id.* ¶ 28).

### i. Amazon and Coolreall

Amazon.com[2] is an information service and system designed so that multiple users across the world can access the servers and browse the Amazon marketplace at the same time. (DSOF, PRSOF ¶ 1). Third parties who wish to sell on the marketplace must set up an account and accept a Business Solutions Agreement ("BSA"). (*Id.* ¶ 3; *see also* PSSOF, DRSOF ¶ 2). Coolreall was a third-party seller that listed and sold products on the Amazon.com marketplace. (DSOF, PRSOF ¶ 4). Coolreall and Amazon entered into the BSA on or around November 2014, and Coolreall sold its first product on the Amazon.com website in February 2015. (PSSOF, DRSOF ¶ 31).

### ii. The agreements between Amazon and Coolreall

The BSA grants Amazon a "royalty-free, non-exclusive, worldwide, perpetual, irrevocable right and license to use, reproduce, perform, display, distribute, adapt, modify, re-format, create derivative works of, and otherwise commercially or non-commercially exploit in any and all" of the third-party seller's "materials", which consists of "all Technology, . . . Trademarks, Content, . . . Product information, data materials, and other items or

| "DSOF" | = | Defendant's statement of facts | DE 27-2 |
| "PRSOF" | = | Plaintiff's response to DSOF | DE 31-2 |
| "PSSOF" | = | Plaintiff's Supplemental Statement of Facts | DE 31-1 |
| "DRSOF" | = | Defendants' response to PSSOF | DE 32-1 |

[2]    I will use "Amazon.com" to refer to the website itself, as opposed to Amazon, the corporate defendant here.

information provided or made available by" the third-party seller. (PSSOF, DRSOF ¶ 3).

The BSA requires that third-party sellers "provide in the format [Amazon] require[s] accurate and complete required product information for each product or service that you offer through any Amazon site." (*Id.* ¶ 4).

The BSA also requires third-party sellers to indemnify Amazon for any claims or losses arising out of the sales of their products. (*Id.* ¶ 5).

After Papataros filed this suit, Amazon made an indemnification demand on Coolreall but received no response. (*Id.* ¶ 24).

The BSA requires third-party sellers to maintain liability insurance naming Amazon as an insured upon reaching the "insurance threshold," *i.e.*, over $10,000 worth of merchandise sold for three consecutive months. (*Id.* ¶ 6). It is undisputed that Coolreall surpassed that insurance threshold. (*Id.* ¶ 7). However, Amazon does not check whether its third-party sellers which meet the threshold are actually in compliance with the BSA's insurance requirement. (*Id.* ¶ 8).

The BSA contains a "most favored nation" provision (terminology mine) which mandates that third-party sellers' pricing for any product be "at least as favorable to Amazon Site users as the most favorable terms upon which a product is offered or sold" via other channels. (*Id.* ¶ 9). Amazon asserts that Coolreall set the price for the scooter. (DSOF ¶ 12). Papataros disputes that assertion to some extent; the "most favored nation" provision of the BSA, she says, does give Amazon some control over the price. (PRSOF ¶ 4) (citing Pl. Ex. 1).

Amazon's customers cannot pay third-party sellers directly. (PSSOF, DRSOF ¶ 18). All payments are processed by Amazon. (*Id.*). Customers may communicate with third-party sellers via the Amazon messaging system or may post public questions, but Amazon does not require third-party sellers to list their contact information on Amazon's website. (*Id.* ¶ 20). Amazon does not

require third-party sellers to identify the manufacturers of the products they sell. (*Id.* ¶ 21).

The BSA gives Amazon "the right in [Amazon's] sole discretion to determine the content, appearance, design, functionality and all other aspects of the Amazon sites, including by redesigning, modifying, removing or restricting access to any of them, and by suspending, prohibiting or removing any listing." (PSSOF, DRSOF ¶ 10). Coolreall, however, provided the content for the product listing and offer displayed on the scooter's product detail page. (DSOF; PRSOF ¶ 6). Amazon asserts that it did not contribute to the content of the product offer or listing for the scooter. (DSOF ¶ 7). According to Amazon, it merely published the offer and detail pages. (*Id.*). In response, Papataros asserts that, pursuant to its agreements, Amazon retains the absolute right to modify the product listing and requires that sellers provide product information in a particular format. (PRSOF ¶¶ 6, 7).

Amazon asserts that Coolreall sourced the scooter from the manufacturer or upstream distributors. (DSOF ¶ 8) According to Amazon, Coolreall or others upstream in the distribution chain prepared, assembled, and packaged the scooter. (*Id.* ¶ 9). Amazon also asserts that Coolreall or others upstream in the chain of commerce made the decisions as to what warnings, instructions, and labeling would accompany the scooter. (*Id.* ¶ 10). Papataros disputes those foregoing assertions, saying they lack supporting evidence. (PRSOF ¶¶ 8–10). Here, Amazon relies in part on the declaration of Charles Wright, its own Associate General Counsel. (DSOF ¶¶ 8–10). I accept Papataros's argument that Wright has not established that he has personal knowledge of Coolreall's operations. (PRSOF ¶¶ 8–10) (citing Fed. R. Civ. P. 56(c)(4)). I will, however, take Wright's declaration as evidence that *Amazon* did not participate in sourcing, preparing, assembling, or packaging the scooter, or in creating the scooter's warnings, instructions, or labels. Amazon's reliance on the BSA I will treat similarly. (DSOF ¶¶ 8–11). Papataros is correct that the BSA does not provide "proof" of how Coolreall or others upstream sourced,

prepared, assembled, packaged, warned, instructed, or labeled the product. (PSOF ¶¶ 8–11). Papataros does not dispute, however, that the BSA demonstrates that Coolreall *agreed* that either itself or others, but not Amazon, was responsible for these activities. (*Id.*). So limited, these exhibits do not raise a disputed issue of fact.

Amazon asserts that Coolreall marketed the scooter and chose to offer it for sale. (DSOF ¶¶ 11). Papataros again disputes Amazon's basis for knowledge and, in addition, asserts that Amazon markets the items on its website and charges sellers like Coolreall for those services. (PRSOF ¶¶ 11). Here, too, I find that Wright lacks personal knowledge of what Coolreall did or did not do, but his declaration is competent evidence that *Amazon* did not market or choose to offer the scooter. Further, the BSA may serve as evidence of the business relationship between Amazon and Coolreall.

All that said, Papataros asserts that Amazon actually did participate in marketing the product. In support, Papataros cites excerpts from the deposition of Amazon's representative Christopher M. Poad, conducted on November 28, 2017 in *Allstate New Jersey Insurance Co. v. Amazon.com, Inc.*, Civ. No. 3:17-2738. (PRSOF ¶ 11 (citing Pl. Ex. 3); PSSOF ¶ 15). Amazon points to some difficulties with reliance on this extrinsic deposition.[3] Amazon does not dispute, however, that third-party sellers who wish to sell on Amazon's website must pay a variety of fees "for the advantages of selling their products on Amazon.com." (PSSOF, DRSOF ¶ 14).

---

[3] There, Poad testified that Amazon charges sellers fees in exchange for services, including the money that Amazon spends on "marketing activity" to bring customers to its website. (Pl. Ex. 3, p. 119:5-24). Amazon disputes this contention "to the extent that [Papataros's] statement mischaracterizes and/or inaccurately or incompletely describes Mr. Poad's use of the term 'marketing activities.'" (DRSOF ¶ 15). The Poad citation suggests that he is a witness whom Papataros could call at trial. Nevertheless, I will not rely on these deposition excerpts unless I receive confirmation that a full copy of the transcript has been supplied to Amazon, which will than have fair warning and an opportunity to cross-designate portions of the deposition for context. Should it prove important, the parties may explore this issue *via* a motion for reconsideration.

Papataros, by the way, cites the case number of *Allstate* as 3:17-2378, which is obviously a typo.

Amazon asserts that any warranty for the scooter was provided not by itself but by Coolreall. (DSOF ¶ 13). Papataros replies, however, that Amazon does provide a warranty for the scooter via its "A-to-Z" Guarantee. (PRSOF ¶ 13 (citing Pl. Ex. 4)). Plaintiff's Exhibit 4 suggests that Amazon's A-to-Z Guarantee applies to "purchases from third-party sellers when payment is made via the Amazon.com website or when you use Amazon Pay for qualified purchases on third-party websites." (Pl. Ex. 4). However, this exhibit does not provide the terms of the A-to-Z Guarantee, so the coverage of that guarantee remains an unsettled issue of fact. (*Id.*).

Many third-party sellers take advantage of the Fulfillment by Amazon ("FBA") program. Under FBA, the third-party seller sends its inventory to an Amazon fulfillment center, where it is stocked until the fulfillment center retrieves it, places it in a shipping container, and delivers it to a shipping carrier for delivery to a customer. (PSSOF, DRSOF ¶ 16). To use the FBA program, third-party sellers pay additional fees, including a monthly storage fee. (*Id.* ¶ 17).

In relation to the FBA program, the BSA requires third-party sellers to provide goods that are suitable for sale. The BSA gives Amazon the right to return or dispose of any products which create "a safety, health or liability risk to Amazon, its personnel, or any third party." (PSSOF, DRSOF ¶ 11).

Coolreall participated in the FBA program. (DSOF, PRSOF ¶15). The scooter was fully assembled and packaged before Coolreall sent it to an Amazon fulfillment center for storage. (*Id.*) Amazon asserts that Coolreall was solely responsible for ensuring that the scooter was properly packaged and complied with all applicable laws. (DSOF ¶ 14).[4]

---

[4] Plaintiff disputes that assertion to the extent it implies that Amazon played no role in packaging or shipping the scooter. (PRSOF ¶ 14). I do not take Amazon to be implying here that it did not participate in shipping the item to Papataros.

Amazon did not design or manufacture the scooter. (DSOF, PRSOF ¶¶ 17, 18). Coolreall retained legal title to the scooter until it was sold to Papataros. (*Id.* ¶ 16). Amazon never held legal title to the scooter. (*Id.* ¶ 19).

At this point, issues of fact start to shade into questions of law. As discussed herein, the major issue here is whether Amazon is considered a "seller" of the scooter under the NJPLA. (*Id.* ¶ 16, 19, 20). Amazon stresses that it "never listed an offer for the scooter." (DSOF ¶ 2). Papataros responds that Amazon is quibbling; it is undisputed that the scooter was ordered through the Amazon.com website. (PRSOF ¶ 2). Further, Amazon asserts that it did not "assemble, blend, package, label, market, repair, or maintain" the scooter. (DSOF ¶ 21). Papataros responds that those denials, like Amazon's ultimate denial that it is a "seller," are legally and factually conclusory. (PRSOF ¶ 21).

### b. Procedural History

On September 22, 2017, Z. Papataros, a minor, by his guardian, Nicole Papataros, filed this complaint against Amazon, Coolreall, and Leray Group (as well as John Does) in New Jersey Superior Court, Bergen County. (Cplt.).

On October 27, 2017, Amazon removed the case, invoking this court's diversity jurisdiction. (DE 1; *see also* 28 U.S.C. § 1331(a)). On November 16, 2017, Amazon filed an answer to the complaint and asserted cross-claims against Coolreall and Leray Group. (DE 5). Coolreall and Leray Group have not responded to the complaint or the cross-claims.

The parties conducted discovery targeted to Amazon's anticipated summary judgment motion. Discovery focused on the issues of whether Amazon was a seller under the New Jersey Product Liability Act and whether the Communications Decency Act ("CDA") precludes Papataros's claims. (DE 11, 12, 16).

On July 25, 2018, Amazon wrote to Magistrate Judge Hammer seeking to apply for a stay of the action pending the Third Circuit's decision in *Oberdorf v. Amazon.com, Inc.*, Case No. 18-1041. *Oberdorf* was an appeal from a decision of the U.S. District Court for the Middle District of Pennsylvania which dismissed

8

claims against Amazon because (1) Amazon was not a seller under Pennsylvania's strict liability law, and (2) the plaintiff's negligence claims were barred by the CDA, 47 U.S.C. § 230. Amazon also cited a potential appeal from a decision of Judge Wolfson in Amazon's favor, *Allstate New Jersey Insurance Co. a/s/o Kathleen Cancel v. Amazon, Inc.*, Civ. No. 17-2738. (DE 17). After a telephone conference, Magistrate Judge Hammer denied Amazon's request for leave to apply for a stay. (DE 22).[5]

On December 21, 2018, Amazon filed its motion for summary judgment in this case. (DE 27). On March 4, 2019, Papataros filed its opposition. (Pl. Opp.). On March 11, 2019, Amazon filed a reply brief. (DE 32). On May 31, 2019, Amazon filed a notice of supplemental authority alerting this Court to *Erie Insurance Co. v. Amazon.com, Inc.*, No. 18-1198, 2019 WL 2195146 (4th Cir. May 22, 2019), an opinion in which the Fourth Circuit held that (1) Amazon is not a seller, and therefore not liable, under Maryland law, and (2) plaintiff's claims against Amazon were not barred by the CDA. (DE 33).

On July 3, 2019, the U.S. Court of Appeals for the Third Circuit filed its decision in *Oberdorf v. Amazon.com*, 930 F.3d 136 (3d Cir. 2019). The *Oberdorf* majority held that Amazon is a seller for purposes of Pennsylvania strict products liability law and that Oberdorf's claims against Amazon were not barred by the CDA. *Id.* Judge Scirica wrote a concurrence and dissent, agreeing with the CDA analysis but concluding that Pennsylvania products liability law precluded treating Amazon as a seller. *Id.*

On July 12, 2019, Papataros cited the newly-decided *Oberdorf* opinion to this Court, arguing that Pennsylvania strict products liability law and New Jersey strict products liability law are similar and that the CDA should not bar the claims against Amazon. (DE 34). On July 23, 2019, Amazon responded, arguing that *Oberdorf* 's holding regarding Pennsylvania product liability law is

---

5    Events overtook us and the *Oberdorf* appeal was recently decided by the Third Circuit, as noted above. The plaintiffs in *Allstate New Jersey Insurance Co. v. Amazon*, Civ. No. 17-2738, never did appeal, as it turned out. I will discuss both cases *infra*.

an outlier, that the result should be different under the NJPLA, and that the CDA shields it from liability. (DE 35). Further, Amazon cited Judge Wolfson's opinion in *Allstate*, and directed the Court to the recent case of *Fox v. Amazon.com, Inc.*, No. 18-5661, 2019 WL 2896326 (6th Cir. July 5, 2019), in which the Sixth Circuit held that Amazon was not a seller under the Tennessee Product Liability Act. (*Id.*).

## Discussion

### A.  Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2509–10 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). That is, the moving party must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Id.*

On the other hand, "with respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the

10

nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23, 106 S. Ct. at 2552).

To demonstrate the existence of a genuine issue, a party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Likewise, "unsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rather, a party must present evidence sufficient to create a triable issue. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510; *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). By evidence, the Rule means "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In construing such evidence, however, the court must draw inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### B. The *Oberdorf* decision

In *Oberdorf, supra*, the Third Circuit considered whether Amazon was strictly liable for injuries from an allegedly defective dog collar purchased on the Amazon.com website. The collar broke, the leash snapped and recoiled, and the plaintiff was blinded in one eye. 930 F.3d at 142.

Oberdorf's strict product liability claim against Amazon was based on two theories: failure to warn and defective design. *Id.* at 142–43. The Pennsylvania district court held that Amazon was not liable because it is not a "seller" under Pennsylvania law and because Oberdorf's claims were barred by the CDA. *Id.* at 143. The Third Circuit for the most part disagreed and reversed, over a dissent as to the Pennsylvania law issue.

The Third Circuit began by discussing Amazon's role in the sale of products on its website, basing its ruling on the following facts. *Id.* at 140–42. Amazon, one of the world's most valuable retail companies, has a website, Amazon.com, that serves as an online marketplace. *Id.* In general, third-party vendors that sell their products on Amazon.com decide what to sell, select the means of shipping, and set prices for their products. *Id.* Amazon lists the products on its website, collects order information, and processes payments in exchange for fees from the third-party vendors. *Id.* In general, Amazon collects two types of fees: commission (usually between 7–15% of sales price) and either a per-item or monthly fee. *Id.* at 142.

Each third-party vendor, the Court noted, must assent to the BSA, which "governs every step of the sales process." *Id.* at 141. Having agreed to the terms of the BSA, the vendor then selects the products it would like to sell (within some broad limits—*e.g.*, no illegal products), and provides Amazon with a description and images of the product. *Id.* Under the BSA, the third-party vendor must also furnish shipping options, availability, and other information reasonably requested by Amazon. *Id.* Based on that information, Amazon formats the product listing on Amazon.com. *Id.* Under the BSA, Amazon retains the rights to determine the content and other aspects of the services it will provide, and it retains broad rights to license and exploit the information provided by the third-party vendors. *Id.* The third-party vendors also have the option to sign up for additional services, such as Fulfillment by Amazon ("FBA"), discussed at p.7, *supra*.

The third-party vendor chooses the price at which to list the product, subject to the "most favored nation" provision that the price and other terms may be no less favorable than those offered on other sales channels. *Id.* The third-party vendors may not communicate directly with customers except *via* Amazon's platform. *Id.*

Amazon requires that all shipping commitments to the customer must be met; accordingly, Amazon requires the third-party vendor to send Amazon shipping information for each order. *Id.* at 142. The Court also noted that timely delivery is incentivized by Amazon's public rating system. *Id.*

Throughout the sales process, Amazon may cease to provide any services at its discretion. *Id.* Amazon may also withhold payment if a vendor behaves in a way that poses a risk Amazon or third parties, and Amazon can require vendors to stop or cancel orders. *Id.* Further, Amazon requires that the third-party vendors "release it and agree to indemnify, defend, and hold it harmless against any claim, loss, damage, settlement, cost, expense, or other liability." *Id.*

Turning to the specific transaction at issue, the Court described Oberdorf's purchase of the dog collar, beginning with her search using the Amazon.com search term box. *Id.* The dog collar was sold by a third-party vendor, "The Furry Gang," which shipped the collar directly to Oberdorf from Nevada. *Id.* The Court noted that neither Amazon nor Oberdorf had been able to contact The Furry Gang.[6] The Furry Gang has not had an active Amazon account since May 2016. *Id.*

Moving to its legal analysis, the Court considered Amazon's argument that it was not subject to Oberdorf's strict liability claim under Pennsylvania common law. 930 F.3d at 143–51. Pennsylvania applies the Second Restatement of Torts § 402A to strict liability claims. Under Section 402A, liability is limited to "sellers" of products. *Id.* at 144.

---

[6]  Or, apparently, any of its furry members.

Of the Pennsylvania "seller" cases, the *Oberdorf* court particularly relied on *Musser v. Vilsmeier Auction Co.,* 562 A.2d 279 (1989). *See Oberdorf,* 930 F.3d at 144. In *Musser,* the Pennsylvania Supreme Court held that an auction house, which "merely provided a market as the agent of the seller" was not liable for injuries caused by a tractor purchased at auction. 562 A.2d at 282. In doing so, *Musser* relied heavily on the policy rationale articulated in comment f of Restatement § 402A.[7] Following *Musser, Oberdorf* held that a court considering seller status under Pennsylvania law should consider four factors:

(1) Whether the actor is the "only member of the marketing chain available to the injured plaintiff for redress";

(2) Whether "imposition of strict liability upon the actor serves as an incentive to safety";

(3) Whether the actor is "in a better position than the consumer to prevent the circulation of defective products"; and

(4) Whether "[t]he [actor] can distribute the cost of compensating for injuries resulting from defects by charging for it in his business, i.e., by adjustment of the rental terms."[8]

*Oberdorf,* 930 F.3d at 144 (quoting *Musser, supra*). All four factors, the Court determined, pointed to liability for Amazon.

---

[7] Comment f reads as follows:

The basis of the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person or even to his buyer in the absence of his negligence.

Restatement (Second) of Torts § 402A cmt. f (quoted in *Oberdorf,* 930 F.3d at 144).

[8] Those four factors, the Court noted, were originally derived from Pennsylvania cases determining whether a lessor should be considered a seller for strict liability purposes. *Id.* at 144 n.17. In a footnote, *Oberdorf* distinguished Pennsylvania law from that of states, such as Tennessee, where the state strict liability statute imposes a single-factor test based on whether the individual exercised sufficient control. *Id.* at 150 n.58 (citing *Fox v. Amazon,* 930 F.3d 415 (6th Cir. 2019)).

Applying the first factor, the Court found that Amazon may be the only party in the marketing chain available to provide redress. It noted that Amazon's marketplace allows third-party vendors to conceal themselves; that numerous cases involved customers who could not locate a third-party vendor; and that Amazon does not vet third-party vendors or take precautions to ensure that they are in good standing. *Id.* at 144–45. The elusive Furry Gang was seemingly a good example of all three; there is no indication that there is a party other than Amazon which is available to be sued.

Applying the second factor, the Court determined that strict liability for Amazon would incentivize safety by giving Amazon the incentive to use its influence for that purpose:

> Although Amazon does not have direct influence over the design and manufacture of third-party products, Amazon exerts substantial control over third-party vendors. Third-party vendors have signed on to Amazon's Agreement, which grants Amazon "the right in [its] sole discretion to ... suspend[ ], prohibit[ ], or remov[e] any [product] listing," "withhold any payments" to third-party vendors, "impose transaction limits," and "terminate or suspend ... any Service [to a third-party-vendor] for any reason at any time." Therefore, Amazon is fully capable, in its sole discretion, of removing unsafe products from its website. Imposing strict liability upon Amazon would be an incentive to do so.

*Id.* at 145–46 (footnotes omitted).

Applying the third factor, the Court determined that Amazon was in a unique position to receive reports of defective products. It is the public face of the transaction, and it collects customer feedback. The third-party vendors, by contract, are restricted in their ability to communicate with customers, except through Amazon. *Id.* at 146–47.

Finally, considering the fourth factor, *Oberdorf* found that Amazon is well positioned to distribute the cost of compensating customers for injuries caused by defects. Indemnification by vendors is more than a theoretical possibility (as it was for the auctioneer in *Musser*); Amazon actually has indemnification agreements with its vendors. *See supra*. Amazon may also adjust the

commission-based fees it charges vendors to account for the risk a product presents. *Id.* at 147.

Such reasoning, *Oberdorf* noted, was in line with other Pennsylvania cases. *Id.* at 147–49. For example, in *Hoffman v. Loos & Dilworth, Inc.*, the Pennsylvania Superior Court held that a sales agent was a "seller" under §402A. 307 Pa. Super. 131, 452 A.2d 1349 (1982). The agent's only role in the sales process was to transmit an order for oil from a packager to a distributor without ever taking possession or title. *Oberdorf* had little trouble in concluding that Amazon's role exceeded that of the agent in *Hoffman*: "Amazon not only accepts orders and arranges for product shipments, but it also exerts substantial market control over product sales by restricting product pricing, customer service, and communications with customers." 930 F.3d at 149.

For all of these reasons, *Oberdorf* concluded that Amazon was properly considered a "seller" and hence subject to strict liability under Pennsylvania law.

*Oberdorf* next considered whether, notwithstanding Pennsylvania law, the product liability claims, which included failure to provide adequate warnings, were barred by Section 230 of the federal CDA. The existence or scope of the CDA bar depended on whether, under the statute, Amazon was a "publisher or speaker" of material posted by the Furry Gang. 930 F.3d at 151. As to some claims, *Oberdorf* held, it was; as to others it wasn't. Accordingly, *Oberdorf* held that the CDA bars "some, but not all, of Oberdorf's claims." *Id.*

Reviewing the CDA case law, the Third Circuit found that those courts tended to focus on the nature of the duty claimed to have been violated. Claims are precluded under the CDA, those cases held, "whenever the duty that the plaintiff alleges the defendant violated derives from the defendants' status or conduct as a 'publisher or speaker.'" 930 F.3d at 152 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009)). The CDA's protection does not extend to a claim, however, "just because it relates to publishing of information on the internet." *Id.* (internal citations omitted).

Oberdorf's claims were not separated into components, but they included a failure-to-warn theory. Amazon, the plaintiff alleged, should have revised the content of the dog-collar listing to include proper safety warnings. *Id.* Applying what amounted to a distinction between claims against Amazon *qua* "speaker" and Amazon *qua* "seller," the Court held as follows:

> To the extent that [the plaintiff's] negligence and strict liability claims rely on Amazon's role as an actor in the sales process,[9] they are not barred by the CDA. However, to the extent that [the plaintiff] is alleging that Amazon failed to provide or to edit adequate warnings regarding the use of the dog collar, we conclude that that activity falls within the publisher's editorial function. That is, Amazon failed to add necessary information to content of the website. For that reason, these failure to warn claims are barred by the CDA.

930 F.3d at 153. Thus, the Court held, Oberdorf's failure-to-warn claims, based on the inadequacy of the Furry Gang's warnings on the website, were barred by the CDA. *Id.* Strict products liability claims, on the other hand, were based on Amazon's role as a seller, and were not barred.[10]

## II. Amazon as a "Seller" under the NJPLA

### 1. The "seller" issue

Papataros brings one count against Amazon and the other defendants. The count is not titled, but it is apparent from its content that it is intended to assert a cause of action for strict liability in tort under the New Jersey Product Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C-1.[11]

---

[9]     The Court noted that Amazon's role as an actor in the sales process includes "receiving customer shipping information, processing customer payments, relaying funds and information to third-party vendors, and collecting the fees it charges for providing these services." 930 F.3d at 152.

[10]     Of course, if the CDA barred strict products liability claims, it would not have been necessary to analyze the Pennsylvania "seller" law at all.

[11]     The count generally asserts that the defendants breached a duty to Papataros "and/or violated the New Jersey Products Liability Act, N.J. S.A. 2A:58C-1." (Cplt. ¶¶ 7, 9). I note that if Papataros meant to assert other theories, the complaint might have identified them more clearly. For purposes of this motion for summary judgment, I focus on the claim of strict liability in tort under the NJPLA, N.J. Stat. Ann. § 2A:58C-1. I briefly address claims for breach of warranty, assuming they were intended, below.

The critical issue under the NJPLA, as it was under Pennsylvania law in *Oberdorf,* is whether Amazon is a "seller." The NJPLA imposes three varieties of liability on sellers:

> A **manufacturer or seller**[12] of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it:
> **a.** deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or
> **b.** failed to contain adequate warnings or instructions, or
> **c.** was designed in a defective manner.

N.J. Stat. Ann. § 2A:58C-2 (emphasis and line breaks added).

So who is a seller? To answer that question in this diversity case, I must apply New Jersey state law. "When interpreting state law, we follow a state's highest court; if that state's highest court has not provided guidance, we are charged with predicting how that court would resolve the issue." *Ill. Nat. Ins. Co. v. Wyndham Worldwide Ops., Inc.,* 653 F.3d 225, 231 (3d Cir. 2011). In such a case, I will seek guidance from

> (1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issue. Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise.

*Id.* (internal citations omitted).

Because the particular state law I am interpreting is a statute, the NJPLA, I look also to the principles that the New Jersey Supreme Court would apply as a guide to interpretation. "The goal of all statutory interpretation is to

---

12    Papataros concedes that Amazon did not manufacture the scooter. (Pl. Opp., p. 2 n.2). The issue, then, is narrowed to whether Amazon was a seller.

give effect to the intent of the Legislature." *Maeker v. Ross*, 99 A.3d 795, 801 (N.J. 2014) (internal citations omitted). To achieve that goal, the court applies the following principles: "In determining the meaning of a statute, we consider first the plain language of the statute. If the language is clear, we interpret the statute consistent with its plain meaning." *Oberhand v. Dir., Div. of Taxation*, 940 A.2d 1202, 1207 (2008) (citing *GE Solid State, Inc. v. Dir., Div. of Taxation*, 132 N.J. 298, 306 (1993)). "If the language is not clear, we look to the legislative history to aid in determining the legislative intent of the statute." *Id.* at 1208.

Not surprisingly, then, the plain language of the NJPLA is the first place to look for the meaning of a "seller" of a product. That term is not defined in N.J. Stat. Ann. § 2A:58C-2 itself, but the same products liability chapter contains an additional definitions section. There, a "product seller" is defined as follows:

> [A]ny person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or **otherwise is involved in placing a product in the line of commerce**. The term "product seller" does not include:
>
> > (1) A seller of real property; or
> > (2) A provider of professional services in any case in which the sale or use of a product is incidental to the transaction and the essence of the transaction is the furnishing of judgment, skill or services; or
> > (3) Any person who acts in only a financial capacity with respect to the sale of a product.

N.J. Stat. Ann. § 2A:58C-8 (emphasis added).

The reader should not be misled by the term "seller." "Seller" is a term of art which may mean different things under the laws of different states, but in New Jersey it encompasses anyone who performs any of the listed functions or "is involved in the placing a product in the line of commerce." *Id.* As the State's intermediate appellate court held in *Agurto v. Guhr*, that definition is broad,

and it draws on established common law: "'This definition encompasses entities within a product's chain of distribution and is consistent with most prior New Jersey case law . . . and the common law' and hence we look to pre-Act cases in construing the Act." 887 A.2d 159, 162 (N.J. Super. App. Div. 2005) (citing *Becker v. Tessitore*, 356 N.J. Super. 233, 248, 812 A.2d 369, 378 (App. Div. 2002)).

New Jersey is liberal in extending liability to all entities in the chain of distribution: "A consumer injured by a defective product may bring a strict liability action against *any* business entity in the chain of distribution." *Mettinger v. Globe Slicing Mach. Co.*, 709 A.2d 779, 783 (N.J. 1998) (emphasis added) (citing *Promaulayko v. Johns Manville Sales Corp.*, 116 N.J. 505, 562 A.2d 202, 204 (1989)). The definition of a "seller," then, is not simply a matter of looking in the dictionary; it is highly dependent on the policies underlying the development of strict liability in tort.

Here, the policies relevant to the imposition of strict liability upon all in the chain of distribution are twofold: "The first principle is the allocation of the risk of loss to the party best able to control it." *Promaulayko*, 562 A.2d at 204 (internal citations omitted). "The second is the allocation of the risk to the party best able to distribute it." *Id.*

## 2. The "broker" line of cases

Still, not all entities involved in a sales transaction have been found liable as sellers. Amazon points in particular to a line of New Jersey cases holding that brokers are not liable under the NJPLA. This feature of New Jersey law, says Amazon, distinguishes it from the Pennsylvania law interpreted in *Oberdorf,* and dictates a different result.

Amazon places particular stress on a 2018 District of New Jersey case in which Judge (now Chief Judge) Wolfson relied on the broker cases to hold that Amazon is not a seller under the NJPLA. *Allstate N.J. Ins. Co. v. Amazon.com, Inc.*, Civ. No. 17-2738, 2018 WL 3546197, at *8 (D.N.J. July 24, 2018) (Wolfson, J.). Before discussing *Allstate,* however, I will place it in context.

*Allstate* stands at the end of a line of broker cases that begins with *Lyons v. Premo Pharmaceutical Labs, Inc.*, 406 A.2d 185 (N.J. Super. App. Div. 1979). *Lyons,* a pre-NJPLA case, applied the New Jersey common law of strict products liability. The New Jersey Superior Court, Appellate Division, held that a broker was not liable for the sale of an FDA-approved drug to a manufacturer which then manufactured and marketed that drug for a use that was shown to be carcinogenic. *Id. Lyons* reasoned that a party must do more than "contribute[] to placing the product in the stream of commerce . . . [I]t must be shown that it exercised control over the product." *Id.* The court emphasized that the broker in that case "had no control over the ultimate packaging and marketing of the product before it was offered to the public." *Id.* at 196. Further, the court noted, the broker never had physical control over the product. *Id.* The broker's role, the court held, was "more that of a facilitator than an active participant." *Id.* Further, the court acknowledged that "[w]hile [the broker] received payment for its part in the transaction, liability is not to be predicated on profit." *Id.* The *Lyons* court highlighted that the plaintiff had already settled with two manufacturers, both of which "were better able than [the broker] to guard against the injury and are, we think, the proper parties to pay." *Id.*

In 1990, the U.S. District Court for the District of New Jersey considered whether a spice broker was strictly liable as a seller. *Oscar Mayer Corp. v. Mincing Trading Corp.*, 744 F. Supp. 79, 80 (D.N.J. 1990). The broker in that case had located a merchant to sell pepper to Oscar Mayer. It was undisputed that the spice broker never took title, possession, or control of the pepper. *Id.* The *Oscar Mayer* court acknowledged that it was

> not aware of a precise definition of "chain of distribution" for the purpose of attributing responsibility under strict liability in tort. The case law strongly suggests, however, that the category is meant to include manufacturers, distributors, suppliers or retailers and other parties that receive, sell, or resell the product. A broker who negotiates a contract of sale between the merchants who will be parties to the actual sale transaction does not fall within this category. Whereas an enterprise engaged in the chain of

21

> distribution can recapture the expense of an occasional defective product by an increase in the cost of the product, and a party that is in a contractual relationship with the manufacturer or supplier is in a position to exert pressure to ensure the safety of the product, *a broker can do neither.*

*Id.* at 84 (emphasis added) (internal citations omitted).

Efforts to claim the protection of *Lyons* and *Oscar Mayer* were not always successful. In the mid-1990s, the U.S. District Court for the District of New Jersey considered whether a dealer in new and used garbage trucks was a seller. *Straley v. United States*, 887 F. Supp. 728, 744 (D.N.J. 1995) (applying the NJPLA prior to the legislature's addition of a definition of product seller). The dealer would accept trucks as trade-ins, take title, and then resell the trucks. For the particular sale in question, the dealer had taken title to and sold a truck on the same day, without ever taking physical possession of the vehicle. *Id.* Still, that was a step too far for the *Straley* court. *Straley* held that the dealer "transcended the role of a mere broker by acting in its own name as an independent legal entity." *Id.* Contrasting the role of a broker, the court stated that "[p]roperly speaking, a broker is a mere negotiator between the other parties, and he never acts in his own name, but in the names of those who employ him . . . ." *Id.* (quoting *Martins Ferreira v. Jayess Corp.*, 214 F.Supp. 723, 727 (D.N.J.1963)).

In the early 2000s, the Appellate Division considered whether Hariton, a company which bought and sold new and used metal-working machinery, would be held strictly liable for injuries caused by a used rolling mill that it had sold to the plaintiff's corporate employer. *Laidlow v. Hariton Mach. Co.*, 762 A.2d 311, 321 (N.J. Super. App. Div. 2000), *rev'd on other grounds*, 790 A.2d 884 (N.J. 2002). Fourteen years after the sale, the plaintiff employee sustained severe injuries to his hand when using the rolling mill. *Id.* He sued, *inter alia,* Hariton. The court found that Hariton had located the machine at the employer's request; that it took title to the machine, but only as a business accommodation; and that it never took possession of the mill or altered its

physical characteristics. *Id.* (emphasis added). Although the injury occurred before the New Jersey legislature had promulgated the statutory definition of a "product seller," *see* p. 19, *supra*, the *Laidlow* court found that definition to be instructive. It held that Hariton was best viewed as a broker, not a seller, and could not be held liable. *Id.* at 321

All of that takes us to the above-cited 2018 district court opinion in *Allstate New Jersey Ins. Co. v. Amazon.com, Inc.* There, Judge Wolfson held that, "as in the broker cases, Amazon may have technically been a party of the chain of distribution, but it never exercised control over the product sufficient to make it a 'product seller' under the [NJ]PLA." 2018 WL 3546197 at *8. Now, I have the benefit—as Judge Wolfson did not—of the Third Circuit's analysis, and in the following section I will consider *Allstate* in light of *Oberdorf*.

*Allstate* placed particular emphasis on the factor of control over the transaction. *Id.* at *9–11. On that score, the court looked to the agreements governing the relationships between the parties and found that the BSA and FBA agreements imposed "clear . . . limits [on] Amazon's control over the product." *Id.* at *8. The BSA, for example, provides that the third-party seller, not Amazon, decides what to sell, sources the product, and ensures that packaging is compliant. Although Amazon's website posts the product, the third-party seller provides the content of the posting. The court also found that, under the BSA, it is really the third-party seller that prices the product. As for third parties who enrolled in the FBA program, the court recognized, Amazon exercised greater control over the transaction. Specifically, Amazon took possession of the product, stored it, and later packaged it (using materials with the Amazon label on them) before shipping it to the purchaser. *Id.* Even so, the plaintiffs had not presented "authority holding that the level of control that Amazon exerted brings it within the bounds of strict liability." 2018 WL 3546197 at *9. Further, Amazon did not "control" the product itself, because the FBA agreement did not give Amazon the right to alter the product. *Id.* The *Allstate* court was not particularly moved by Amazon's status as the buyer's

23

primary point of contact, even though it had led the plaintiff to believe that Amazon was the seller. *Id.* at *11.

The *Allstate* court then turned to *Promaulayko*'s twin public policy factors: ability to distribute the cost of accidents through pricing, and ability to influence the manufacturer to produce a safer product. These, it found, weighed against liability. As to the first, *Allstate* found that Amazon was unable to act as an insurer because it did not have a relationship with the manufacturer and it did not have the discretion to raise prices. *Id.* As to the second, the court considered that the BSA included the third-party seller's agreement to indemnify, and that therefore Amazon was best positioned to distribute costs up the distribution chain. *Id.* at *12. Even so, the court found that it was still an open question whether the plaintiff could bring suit against another party, such as the manufacturer. *Id.* Further, the court found that deeming Amazon a seller would conflict with the New Jersey legislature's intent to "limit[] the expansion of products-liability law" and "reduce costs borne by innocent retailers." *Id.* (internal citations omitted).

The *Allstate* court also found it persuasive that a half-dozen cases applying other states' laws had found that Amazon is not in the class of actors subject to strict liability. *Id.* at *10. One of those, however, was *Oberdorf v. Amazon.com, Inc.*, 295 F. Supp. 3d 496, 499 (M.D. Pa. 2017), the case recently overturned by the Third Circuit in *Oberdorf v. Amazon.com Inc.*, 930 F.3d 136 (3d Cir. July 3, 2019), discussed above.

Balancing all considerations, the *Allstate* court found that Amazon could not be considered a "product seller" under the NJPLA. *Id.* at *8–11.

### 3. Application of seller/broker precedent

As noted above, the applicability of *Oberdorf* depends on the similarity, or not, of the definition of a "seller" under Pennsylvania and New Jersey law. New Jersey's statutory definition of a seller, a term of art, includes anyone "involved in placing a product in the line of commerce." N.J. Stat. Ann. § 2A:58C-8. For current purposes, that very broad definition is limited primarily by the "broker"

line of cases, surveyed in Section II.C.2, *supra*. Taken as a whole, those holdings suggest that a New Jersey court considering whether a defendant is a seller subject to strict liability under the NJPLA will assess both (a) the indicia of defendant's control and (b) the four Restatement policy considerations enunciated in *Oberdorf*. I discuss those issues in the following two subsections.

### a. Control

Pennsylvania law, like New Jersey law, considers the extent to which the product was in the "control" of the putative "seller." *See Barris v. Bob's Drag Chutes & Safety Equip., Inc.*, 685 F.2d 94, 98–99 (3d Cir. 1982) (stating that Pennsylvania law requires a showing that "the product was defective [and] that the defect existed while the product was in the control of the manufacturer or retailer . . . ."). To that extent, the two states' laws overlap. Still, the case law cited in Section II.c.2, *supra*, including *Allstate,* tends to suggest that New Jersey will analyze control as a standalone factor, rather than folding it into the discussion of the four Restatement policy factors enunciated in *Oberdorf*.

Under the NJPLA, it is particularly important to consider the degree to which the defendant "controls" the product or the manner in which it is sold, as opposed to being a mere broker or facilitator of a sale.

> [E]ven when there is 'no doubt' that a party is 'in the chain of distribution and contributed to placing the product in the stream of commerce,' it, nonetheless, 'must be shown that [the party] exercised control over the product.' *Lyons v. Premo Pharmaceutical Labs, Inc.*, 170 N.J. Super. 183, 196 (App. Div 1979). (citing *Scanlon v. General Motors Corp.*, 65 N.J. 582, 590 (1974)). The focus is on a party's control of the product itself–that is, the ability to exercise dominance over, for example, the manner in which the product is sold.

*Allstate N.J. Ins. Co. v. Amazon.com, Inc.*, 2018 WL 3546197 at *7. Indicia of such control include the extent to which the defendant held title, took physical possession, or altered the product, and the extent to which it dictated the manner of sale. *See* Section II.c.2, *supra*.

Unlike the brokers in *Oscar Mayer* and *Laidlow,* Amazon exerted control by taking physical possession of the product. Not only did Amazon take

physical possession; it also shipped the product to the customer in its own box. (PSSOF, DRSOF ¶ 16). While Amazon never took title to the property, it adopted a proprietary stance with respect to the sale. It physically delivered the product (*id.*), confirmed the sale with a "thank you for shopping with us" message (*id.* ¶ 28), and allowed communication between the third-party vendor and the buyer only through Amazon's own website, (*id.* ¶ 20). In short, even by its own statements, Amazon indicated that it was more than just a "mere negotiator" in this sale. *Straley*, 887 F. Supp. at 744.

In light of these facts, I give less weight than did *Allstate* to the control factor. It is true that the agreements did not make Amazon the ultimate decisionmaker as to the prices or physical qualities of the product. As to the sale process, however, the level of control was greater. For example, Amazon processed all payments. (PSSOF, DRSOF ¶ 18). Coolreall was required to provide information about its product in the manner that Amazon prescribed. (*Id.* ¶ 4). Amazon exercised control over the listing itself—in particular, it retained the right to change, suspend, prohibit or remove listings. (*Id.* ¶ 10). If notified that a product was defective, Amazon had the power to take it off the shelf, *i.e.*, to remove the website listing and thereby shield innocent consumers. Under the FBA program, Amazon even had the right to dispose of products that were defective. (*Id.* ¶ 11).

Compare *Oberdorf*, in which the vendor did not use Amazon's fulfillment services, so Amazon never physically possessed or shipped the product. Not so here. The vendor in our case signed the FBA and used the fulfillment services, so Amazon physically took custody of, packaged, and shipped the scooter which injured the plaintiff. *Oberdorf*, moreover, gave greater weight to facts demonstrating that Amazon exerts substantial, if not ultimate, control over product sales:

> Amazon not only accepts orders and arranges for product shipments, but it also exerts substantial market control over product sales by restricting product pricing, customer service, and communications with customers.

*Oberdorf*, 930 F.3d at 149. There is no indication that the underlying facts about Amazon's business practices, as found in *Oberdorf*, should be interpreted differently here.

The control factor under New Jersey law, then, does not suggest a different result from that in *Oberdorf*.[13]

### b. Public policy considerations

I move to the tort policy factors that influence the definition of a liable seller (*i.e.*, a person who "otherwise is involved in placing a product in the line of commerce." N.J. Stat. Ann. § 2A:58C-8).

New Jersey law and Pennsylvania law substantially coincide insofar as they impose liability based on the policies embodied in the Second Restatement of Torts § 402A and comment f:

> The doctrine of strict liability applies to the seller of a defective product if, among other things, the seller is "engaged in the business" of selling such product. *2 Restatement, Torts,* 2d, § 402A (1965). The doctrine has developed primarily in actions against manufacturers and sellers who place products in the stream of commerce. *E.g., Brown v. United States Stove Co.,* 98 N.J. 155, 484 A.2d 1234 (1984); *Soler v. Castmaster, Div. of H.P.M. Corp., supra; O'Brien v. Muskin Corp., supra; Michalko v. Cooke Color & Chem, Corp., supra; Suter v. San Angelo Foundry & Machine Co., supra.* However, the rule of strict liability does not apply to an occasional seller who is not engaged in the activity as a part of its business. *Restatement, supra,* § 402A, comment *f.*

*Santiago v. E.W. Bliss Div., Gulf & W. Mfg. Co.,* 492 A.2d 1089, 1095 (N.J. Super App. Div. 1985).

---

[13]    *Oberdorf* distinguished Pennsylvania law from the law in other states, such as Tennessee, where the state strict liability statute imposes a single-factor "control" test, without reference to such tort policies. 930 F.3d at 150 n.58 ("The Sixth Circuit case was explicitly based on a Tennessee statute that applied a different test than that of § 402A of the Second Restatement, namely, whether an 'individual [was] regularly engaged in exercising sufficient control over a product in connection with its sale.'" (citing *Fox v. Amazon,* 930 F.3d 415 (6th Cir. 2019)). Because New Jersey considers tort policy, as well as control, it falls more in the Pennsylvania, not the Tennessee, category.

Thus, it makes sense that the four tort policy considerations discussed in *Oberdorf*, which were derived from § 402A comment f, would complement, not contradict, the analysis under New Jersey law. In *Promaulayko*, the New Jersey Supreme Court gave particular prominence to two of those policy factors: (a) the party's ability to distribute the cost of accidents through pricing, and (b) that party's ability to influence the manufacturer to produce a safer product. 116 N.J. 505, 562 A.2d at 204.[14]

First, I consider pricing and Amazon's ability to spread the cost of defects as a quasi-insurer. Most significantly, Amazon collects a fee in connection with each product sold on the site (*Id.* ¶¶ 14, 17), and possesses considerable market clout. If Amazon wished to adjust its business model to spread the costs of defective products among consumers, it could do so. As noted in *Allstate,* Amazon does not literally set the price. As noted in *Oberdorf,* however, Amazon may nevertheless spread the cost of accidents through its fee structure. Amazon may increase the fees it charges third-party vendors to account for the risk of defective products and make the price—particularly the portion of the price retained by Amazon—reflect that risk. Any such increase would no doubt flow through the vendors and be reflected in the listed price of products. That, as much as Amazon may object, represents the system working as intended.[15]

---

[14] These two *Promaulayko* factors are closely analogous to the second and fourth factors derived from Restatement § 402 comment f, relied upon by *Oberdorf. See* p. 14, *supra.* For the reasons stated below, the analysis of them incorporates the concerns of factors one and three as well. *See* nn. 16 & 17, *infra,* and accompanying text.

[15] Here, Amazon may assert that "liability is not to be predicated on profit," *Lyons,* 406 A.2d at 192. However, Amazon is not liable because it made a profit; it is liable because its business model creates a structural problem that impedes compensation of an injured purchaser. Amazon has created a market in which third-party sellers may pay a fee to sell their products on Amazon's market without exposing even their location or contact information to customers. Later, when the products cause injury, the third-party seller may be difficult to find, assuming it is even in the United States. It is not the norm in the law that a party may interpose itself to shield another from liability without taking on liability itself. Tort policies weigh against a structure that would leave consumers without recourse.

In this respect, *Oberdorf* found it particularly relevant—and so do I—that Amazon stands between the consumer and a manufacturer/seller who may or may not be available to provide redress. (The Furry Gang and Coolreal illustrate the point; they apparently cannot be located, even by Amazon.)[16] Amazon, if subject to liability, will likely make greater efforts to vet its vendors and ensure their availability. Assuming the vendors are available, Amazon has in place indemnity agreements in the BSA, and it also has required that vendors name Amazon as an insured on their liability insurance. All of these facts suggest that, as expressed in *Oberdorf,* Amazon is best—perhaps uniquely—situated to spread the cost of accidents.

Second, and relatedly, I consider whether Amazon is the party best able to influence manufacturers to observe safety standards. One such safety incentive is obviously monetary; a manufacturer liable to bear the costs of accidents will take precautions to avoid them, as noted under the first factor. But where, as here, the business model is set up to insulate the consumer from the ultimate manufacturer, Amazon is really the only party situated to distribute such costs up the marketing chain to those who should bear them. As noted in *Oberdorf,* Amazon restricts direct communication between customers and vendors, but it does collect feedback from customers, so it is in a position to receive reports of defective products. Moreover, through its relationships with its vendors, Amazon could, if it wished, more directly enforce safety standards and influence them to produce safer products. Those factors apply no less under New Jersey law than they did in *Oberdorf*:

> Although Amazon does not have direct influence over the design and manufacture of third-party products, Amazon exerts substantial control over third-party vendors. Third-party vendors have signed on to Amazon's Agreement, which grants Amazon "the right in [its] sole discretion to ... suspend[ ], prohibit[ ], or remov[e] any [product] listing," "withhold any payments" to third-party

---

16    Although analyzed under the *Promaulayko* "distribution of costs" factor, the unavailability of other potential defendants is obviously relevant to the first § 402A factor: whether the actor is the "only member of the marketing chain available to the injured party for redress." *Oberdorf,* 930 F.3d at 144.

vendors, "impose transaction limits," and "terminate or suspend
. . . any Service [to a third-party-vendor] for any reason at any
time." Therefore, Amazon is fully capable, in its sole discretion, of
removing unsafe products from its website. Imposing strict liability
upon Amazon would be an incentive to do so.

*Oberdorf*, 930 F.3d at 145–46 (footnotes omitted).[17]

Amazon's control of the product, its relationship with the third-party
sellers, and the structure of the Amazon marketplace all weigh in favor of
finding that Amazon was a seller, not a mere broker or facilitator, in relation to
the purchase of the scooter that is the subject of this action. Nothing about
New Jersey law sufficiently undermines the analysis of *Oberdorf*. I therefore am
bound to hold that Amazon is a party subject to strict liability as a seller under
the NJPLA.

### ii.  The CDA

Section 230 of the CDA provides that "No provider or user of an
interactive computer service shall be treated as the publisher or speaker of any
information provided by another information content provider." 47 U.S.C.
§ 230(c)(1).

Amazon argues that, even if Papataros has claims under state law, those
claims are barred by the CDA. (MSJ, pp. 22–28). As previously noted, this one-
count complaint fairly clearly expresses a general claim for strict liability under
the NJPLA. Amazon, attempting to clarify on Papataros's behalf, suggests that
any other claims relating to the sale of the scooter "are essentially that Amazon
should not have published Coolreall's offer or should have otherwise policed its
content." (MSJ, p. 22). Papataros, in her brief, vaguely asserts that the claims
arise out of Amazon's role as a "Product Seller." (Pl. Opp. p. 17) As to the main
strict-liability claim under the NJPLA, that is surely true. The single count of
the complaint also, however, seems to include "speaker" based claims such as

---

[17]      Again, although analyzed under the *Promaulayko* "incentive to safety" factor,
these facts are obviously relevant to the third § 402A factor: whether the actor is "in a
better position than the consumer to prevent the circulation of defective products."
*Oberdorf*, 930 F.3d at 144.

"defective, hazardous, and/or inadequate . . . warning(s)," (Cplt. ¶ 1), as well as a claim that the defendants breached their duties to exercise due care in warning about dangers posed by the product, (Cplt. ¶¶ 5-9). Such warning-based claims do not surmount the threshold bar of the CDA.[18]

In *Oberdorf*, the Third Circuit held that the CDA barred such warning-based claims against Amazon:

> To the extent that [the plaintiff's] negligence and strict liability claims rely on Amazon's role as an actor in the sales process, they are not barred by the CDA. However, to the extent that [the plaintiff] is alleging that Amazon failed to provide or to edit adequate warnings regarding the use of the dog collar, we conclude that that activity falls within the publisher's editorial function. That is, Amazon failed to add necessary information to content of the website. For that reason, these failure to warn claims are barred by the CDA.

2019 WL 2849153 at *12.

*Oberdorf* states the rule within this circuit. To the extent that Papataros has brought claims against Amazon for failure to provide or edit adequate warnings on its website, those claims are barred by the CDA. Papataros's strict liability claims under the NJPLA, however, are not barred by the CDA.

---

[18]    I am not oblivious to the context or the stakes here. It has been said that the "twenty-six words" of Section 230 of the CDA, enacted in 1996, made e-commerce itself economically feasible by permitting platforms such as Amazon.com to match sellers with buyers without taking on the seller's liabilities. *See, e.g.*, J. KOSSEFF, *The Twenty-six Words that Created the Internet*, Cornell University Press (2019). It would perhaps be more sober and accurate to say that the twenty-six words of Section 230 promoted or facilitated important aspects of the internet as we now know it. A recent *New York Times* article, to pick an example almost at random, is a useful backgrounder on Section 230's evolution as a tool for promotion of e-commerce (whether sly or serendipitous depends on your point of view). https://www.nytimes.com/2019/08/06/technology/section-230-hate-speech.html The article notes that political leaders as ideologically diverse as House Speaker Nancy Pelosi (D-Cal) and Senator Ted Cruz (R-Tex) have publicly criticized Section 230 as a giveaway to the tech industry, and have raised the possibility of reform or abolition.

These e-commerce issues are to be distinguished, however, from others that are driving the current debate, such as Section 230's grant of immunity for speech-based harms such as hate speech or libel. *Id.*; *see also Reno v. ACLU*, 521 U.S. 844 (1997).

### iii.  Warranty claims

Amazon has also moved to dismiss[19] any separate claim that it "expressly and impliedly warranted" the scooter. (MSJ, p. 21).

Amazon asserts that an implied warranty claim, even if it had been clearly pled (it wasn't), would be subsumed by the NJPLA. I agree. *See* N.J. Stat. Ann. § 2A:58C-1(b)(3); *Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.*, 936 F. Supp. 2d 441, 447 (D.N.J. 2013) ("[T]he [NJ]PLA does not recognize either negligence or implied breach of warranty as separate claims for harm caused by a defective product; those claims have been 'subsumed within the new statutory cause of action.") (internal citations omitted)).

That leaves express warranty. Amazon argues that, to the unclear extent to which Papataros may have intended to assert a cause of action for breach of express warranty, the complaint fails to state a claim.[20] Papataros has made no response to that argument. (Pl. Opp.)[21] Whether or not that constitutes a waiver, I independently find that Papataros has failed to state a claim for breach of an express warranty. The elements of such a claim are (1) "that [Amazon] made an affirmation, promise or description about the product; (2)

---

[19]    Here, Amazon does not rely on affidavits or evidence, but directs its arguments to the complaint itself. Papataros's response likewise does not cite affidavits or evidence. This might be regarded, then, as a summary judgment motion that bypasses disputes of fact and proceeds directly to the movant's "entitle[ment] to judgment as a matter of law." Fed. R. Civ. P. 56(a). Alternatively, it might be treated as the equivalent of a motion for judgment on the pleadings. *See* Fed. R. Civ. P 12(c). Federal Rule of Civil Procedure 12(h)(2) "provides that a defense of failure to state a claim upon which relief can be granted may also be made by a motion for judgment on the pleadings." *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). Accordingly, when a Rule 12(c) motion asserts that the complaint fails to state a claim, the familiar Rule 12(b)(6) standard applies. *Id.* The procedural vehicle matters little.

[20]    Amazon also moves to dismiss the warranty claim because "Amazon did not sell the scooter." (DE 27-1 p. 21). That issue was discussed above. Amazon adds that its Conditions of Use disclaim all warranties. (*Id.* pp. 21–22) Because discovery was limited to the NJPLA and CPA issues expected on summary judgment, I will not consider this extraneous (and now superfluous) argument regarding the warranty claim.

[21]    While Plaintiff's Opposition does refer in passing to the A-to-Z Guarantee, it does not do so in connection with its express warranty claim. (Pl. Opp.).

that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *McDonough v. Bayer Healthcare, LLC*, 2011 WL 2119107, at *4 (D.N.J. 2011). The complaint makes no more than a mention of an express warranty; it does not set forth facts to support a plausible inference that these three elements are satisfied; and, to the extent it might seek, for example, to attribute Coolreall's warranty language to Amazon, that claim would be barred by Section 230 of the CDA. The complaint fails to state a claim of breach of express warranty.

### III. Conclusion

For the reasons set forth above, I will GRANT in part and DENY in part Amazon's motion (DE 27) for summary judgment as follows:

- The motion is DENIED insofar as it is based on the argument that Amazon is not a product seller under the NJPLA.
- The motion is GRANTED insofar as it is based on the argument that Papataros's claims against Amazon for failure to provide or edit adequate warnings on its website are barred by Section 230 of the CDA; however, the motion based on the CDA bar is DENIED as to all other claims.
- Amazon's motion to dismiss Papataros's express and implied warranty claims against Amazon, to the extent such claims may have been asserted at all, is GRANTED.

What remains, then, is a straightforward assertion of strict product liability under the NJPLA. An appropriate order follows.

Dated: August 26, 2019

**Kevin McNulty**
**United States District Judge**